IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| H&A LAND CORPORATION d/b/a § | |
| SHOWTIME CABARET § | CIVIL ACTION NO. 4:05-CV-210-Y |
| § | |
| VS. § | |
| § | |
| CITY OF KENNEDALE, TEXAS § | |

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pending before the Court is plaintiff H&A Corporation d/b/a Showtime Cabaret ("H&A")'s Motion for Preliminary Injunction [doc. # 15-2]. Having carefully reviewed the motion, response, and reply, the Court concludes that the motion should be DENIED.

I. BACKGROUND

H&A operates a sexually oriented business--Showtime Cabaret ("Showtime"), an exotic-dancing venue--on property in Tarrant County, Texas, annexed in 1999 by defendant City of Kennedale, Texas ("Kennedale"). Kennedale's ordinances at the time of annexation, as well as those enacted afterward (collectively, "the Ordinances"), prohibited H&A, as well as other sexually oriented businesses in the area, from operating in their locations at the time of annexation. In essence, the Ordinances deemed H&A and the other sexually oriented businesses "nonconforming uses" of the land upon which they were operating.

On May 20, 2002, H&A filed suit ("the initial suit") in this Court against Kennedale for injunctive and declaratory relief in relation to the Ordinances. Through intervention or consolidation, other sexually oriented businesses impacted by the Ordinances also

became involved in the initial suit.  H&A's involvement in the initial suit ended in December 2002 when it moved to dismiss with prejudice its claims against Kennedale pursuant to a November 14, 2002, settlement agreement.  Under that agreement, Showtime "[could] be operated as an adult cabaret as defined in [Kennedale]'s Sexually Oriented Business Ordinance (as amended from time to time) for so long as it [wa]s owned and/or controlled by H&A []."  (Pl.'s App., Ex. A, at 2 (Settlement Ag.).)  In exchange for Showtime's operating site's being deemed a "conforming location" for purposes of Kennedale's zoning code, H&A agreed (among other things) to drop its claims in the initial suit.  (*Id.*)

On January 13, 2005, after a public hearing before Kennedale's planning and zoning board, Kennedale passed and approved Ordinance Number 287 ("Ordinance 287"), which amended the Ordinances and Ordinance No. 108 specifically (the main ordinance regulating sexually oriented businesses in Kennedale).  The amendments in Ordinance 287 restrict the hours that sexually oriented businesses may operate, impose a buffer zone for exotic performances, require a minimum stage height, prohibit any employee of a sexually oriented business from appearing in a "state of nudity" if alcohol is served in the business, require dancers to wear "pasties", limit the methods by which customers may tip performers in sexually oriented businesses by prohibiting direct tipping, and require that any employee of a sexually oriented business obtain a permit in order to work in such business.  (*Id.*, Ex. 2 (Ordinance 287).)

2

On March 30, 2005, in response to Ordinance 287, H&A sued Kennedale in the present action for declaratory relief, injunctive relief, violation of 42 U.S.C. § 1988, and breach of contract (the parties' 2002 settlement agreement). H&A filed its motion for preliminary injunction on December 23 and an amended brief in support of that motion on January 10, 2006.

## II. ANALYSIS

Under well settled Fifth Circuit precedent, a preliminary injunction is an extraordinary remedy that should not be granted unless the movant demonstrates by a clear showing: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant outweighs any harm to the nonmovant that may result from the injunction; and (4) that the injunction will not undermine the public interest. *See Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990).

A.   Substantial Likelihood of Success on the Merits

   1.   First-Amendment Claims[1]

The First Amendment protects sexually explicit speech, whether film, video, print, or symbolic, that is not obscene. *TK's Video v. Denton County*, 24 F.3d 705, 707 (5th Cir. 1994) (citing *Mitchell*

---

[1] H&A's first, second, third, fourth, and seventh claims for relief rest upon Kennedale's alleged violation of the First Amendment, made applicable to the states by the Fourteenth Amendment. *See* U.S. CONST. amend. XIV; *Thornhill v. Al.*, 310 U.S. 88, 95 (1940) (citation omitted); *Meltzer v. Bd. of Pub. Instruction*, 548 F.2d 559, 575 (5th Cir. 1977) (citation omitted);

3

*v. Commission on Adult Entertainment Establishments*, 10 F.3d 123, 130 (3rd Cir. 1993)). Society's interest in protecting such speech, however, "is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate." *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 70 (1976) (plurality opinion). Given this distinction, restrictions on sexually expressive speech are permissible under certain circumstances. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).

H&A's claims rest upon an inference that the manner in which nude dancing may occur and the viewing of such performance constitute activities safeguarded by the First Amendment. Such activities, however, fall only within the outer ambit of the First Amendment's protection, if at all. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (citing *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-566 (1991) (plurality opinion); *Schad v. Mount Ephraim*, 452 U.S. 61, 66, (1981)).[2] Because customary "barroom" nude dancing barely manages to qualify as expressive conduct protected by the First and Fourteenth Amendments, the protections afforded such expression are limited. *See Barnes*, 501 U.S. at 565-566 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); *Cal. v. LaRue*, 409 U.S. 109, 118 (1972); *Schad*, 452 U.S. at 66).

---

[2] The act of being in the nude is not, in and of itself, entitled to First Amendment protection because no message is being conveyed. *Cf. Tex. v. Johnson*, 491 U.S. 397, 403-406 (1989) (finding that the act of desecrating the flag is not critical in determining whether the actor is engaging in expressive conduct; rather, the question is whether the actor intended to convey a particularized message). Yet the act of dancing nude, with its attendant erotic message, is an expressive act entitled to protection through the First Amendment. *See Barnes*, 501 U.S. at 560.

4

(a) <u>Determining the Level of Scrutiny Applicable:
Content-Neutral versus Content-Based Regulations</u>

The level of scrutiny a court must apply to regulations on speech is determined by the animus behind the official regulation. *See Erie*, 529 U.S. at 289 (citation omitted). A court must evaluate "if the governmental purpose in enacting the regulation is unrelated to the suppression of expression," *id.*; in essence, if it is content-neutral. If it is, the regulation need only satisfy the standard articulated in *United States v. O'Brien*, 391 U.S. 367, 377 (1968)--the "less stringent" standard for evaluating restrictions on symbolic speech.[3] *See Erie*, 529 U.S. at 289 (citing *Tex.*, 491 U.S. at 403; *O'Brien*, 391 U.S. at 377). If, however, the government's regulation of expressive conduct is because of disagreement with the message conveyed--i.e., is content based--"the regulation falls outside the scope of the *O'Brien* test and must be justified under a more demanding standard." *Id.* Thus, for *O'Brien* to apply, a court must verify that the predominate concerns motivating the

---

[3] There are two paths governing the evaluation of First Amendment claims asserted by a sexually oriented business. The first is that articulated by the Supreme Court in *O'Brien*, which typically applies where a government regulates the *manner* of permissible speech, such as restrictions on public nudity. *See Erie*, 529 U.S. at 289; *Barnes*, 501 U.S. at 565-66. Governmental attempts to regulate the *location* where such expression can take place, i.e. zoning ordinances, however, are subject to the standard developed in *Renton* and its progeny. *See Renton*, 475 U.S. at 41; *City of L.A. v. Alameda Books*, 535 U.S. 425 (2002); *Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 288 (5th Cir. 2003); *N.W. Enters. v. City of Houston*, 352 F.3d 162 (5th Cir. 2003); *Lakeland Lounge*, 973 F.2d at 1255; *SDJ, Inc. v. Houston*, 837 F.2d 1268 (5th Cir. 1988); *J & B Entertainment v. City of Jackson*, 152 F.3d 362 (5th Cir. 1998). Since Ordinance 287 regulates the manner with which H&A may conduct its business, as opposed to the location where such business may be situated, *O'Brien* governs this suit. *See Erie*, 529 U.S. at 289 ("government restrictions on public nudity . . . should be evaluated under the framework set forth in *O'Brien*."); *LLEH, Inc. v. Wichita County*, 289 F.3d 358 (5th Cir. 2002).

regulating body were the secondary effects of the expressive conduct regulated, not the content of such expression. *See id.* at 289-96; *Alameda Books*, 535 U.S. at 440-41 (quoting *Renton*, 475 U.S. at 47). In essence, the court must ask whether the ordinance aims to regulate the content or the consequences of sexually explicit speech. *See TK's Video*, 24 F.3d 705 at 707.

By its terms, Ordinance 287 regulates mostly nonexpressive conduct. Again, Ordinance 287 is directed towards a viewer's proximity to dancers, the consumption of alcohol where performances are given, direct tipping, and employee permits. (Pl.'s App., Ex. 2 (Ordinance 287).) Such restrictions are on matters wholly outside the expressive content of the dancing itself. *See Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002) ("Gary remains free to observe and engage in nude dancing, but she simply cannot do so . . . in establishments that primarily derive their sales from alcoholic beverages consumed on the premises."); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 726 (6th Cir. 2003) ("Section 5(b) does not impose any restrictions whatsoever on a dancer's ability to convey an erotic message. Instead, the regulation prohibits Sexually Oriented Businesses . . . from serving alcoholic beverages to its patrons during a dancer's performance. This is not a restriction on erotic expression, but a prohibition of nonexpressive conduct (i.e., serving and consuming alcohol) during the presentation of expressive conduct.") As the Fifth Circuit has already stated:

> [I]ntentional contact between a nude dancer and a bar patron is conduct beyond the expressive scope of the dancing itself. The conduct at that point has overwhelmed any expressive strains it may contain. That the physical contact occurs while in the course of protected activity does not bring it within the scope of the First Amendment. *Cf. Barnes*, 111 S. Ct. at 2466 (Scalia, J., concurring in the judgment) (noting that the Court has "never invalidated the application of a general law simply because the conduct that it reached was being engaged in for expressive purposes").
> Similarly, patrons have no First Amendment right to touch a nude dancer. *Cf. Geaneas v. Willets*, 911 F.2d 579, 586 (11th Cir. 1990) (holding that bar patrons have no First Amendment right to wear revealing clothing), *cert. denied*, 499 U.S. 955, 111 S. Ct. 1431, 113 L. Ed. 2d 484 (1991); *Dodger's Bar & Grill, Inc. v. Johnson Cty. Bd. of Comm'rs*, 32 F.3d 1436, 1443 (10th Cir. 1994) (same).

*Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1253 (5th Cir. 1995). The same rationale applies to the provisions of Ordinance 287. Surely, if a prohibition on touching a nude dancer is outside the protections of the First Amendment, then restrictions on proximity, alcohol consumption, and employee qualifications are equally so, i.e., "beyond the expressive scope of the dancing itself." *Id.* Such activity has no bearing on the *expression* of the dancing; rather, it impacts the viewer's experience. And, the viewer is not restricted from observing nude dancing, he simply experiences a limited ability to do so.

Moreover, Ordinance 287 replaces and updates provisions of the Ordinances that were the subject of the initial suit. Such ordinances have already been found by this Court to be content-neutral regulations targeting the secondary effects of sexually oriented businesses rather than the expressive activity taking

7

place at such establishments. *See H & A Land Corp. v. City of Kennedale ("H&A I")*, CIVIL ACTION NO. 4:02-CV-458-Y, 2005 U.S. Dist. LEXIS 8192, at *15-19 (N.D. Tex. March 29, 2005) (Means, J.);[4] *cf. Erie*, 529 U.S. at 290 (noting that the challenged ordinance "replaces and updates provisions of an 'Indecency and Immorality' ordinance . . . on the books since 1866.").

Furthermore, "[i]n deciding whether an ordinance is designed to address undesirable secondary effects and is therefore con-

---

[4] Specifically, the Court stated that:

> The Ordinances either specifically state, or amend and adopt the findings of prior ordinances that state, that the Kennedale city council seeks to minimize and control the adverse secondary effects of sexually oriented businesses. (Def.'s App. to Mot. for Summ. J. at 2-3, 31-32, 48, 79, 91-92, 97-98 (Ordinances)). Although merely mentioning "secondary effects," or its functional equivalent, within an ordinance's preamble "may not save a statute 'formulated without specific attention to specific secondary effects,'" *see J & B Entertainment*, 152 F.3d at 374 (quoting *Lakeland Lounge*, 973 F.2d at 1259), the [O]rdinances here include the requisite degree of specificity. The [O]rdinances demonstrate that Kennedale not only made specific findings of the adverse effects generally associated with sexually oriented businesses, but also that Kennedale sought to remedy specific adverse effects, namely, increased crime, decreased property values, sexual-crime activity, and the spread of sexually transmitted diseases. *See . . . J & B Entertainment*, 152 F.3d at 374 ("No explanation of what specific secondary effects motivated [the city] to enact the Ordinance appears in its text, and the City Council failed to make any specific legislative findings prior to enactment"). The record also reflects that, in enacting the [O]rdinances, Kennedale relied upon studies conducted for other cities, statements made at public hearings, a survey conducted by Kennedale's attorney, and other information compiled by Kennedale's attorney that was presented to the Kennedale city council. (*Id.* at 2-3, 31-32, 91-92, 97-98; App. to Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. at 386-96 (Hearing Minutes), 449-53 (Olson Aff.), 454-56 (Miller's 2nd Aff.)). Furthermore, Ordinance No. 108 specifically states that the ordinance is directed not at limiting protected speech but rather at controlling the adverse effects associated with such expression. (*Id.* at 2-4).
> The record therefore demonstrates that the [O]rdinances are predominantly concerned with and seek to address the secondary effects from, rather than the content of, the form of speech regulated. . . . As such, the Court concludes that the [O]rdinances were not adopted because of disagreement with the message conveyed and therefore constitute content-neutral regulations. *See SDJ*, 837 F.2d at 1268; *Lakeland Lounge*, 973 F.2d at 1258-59.

*H & A I*, 2005 U.S. Dist. LEXIS 8192, at *15-19.

tent-neutral or is instead intended to suppress speech, courts 'must give great deference to the stated goals of the [acting governmental body].'" *Cmty. Visual Communs., Inc. v. City of San Antonio*, 148 F.Supp.2d 764, 775 (W.D. Tex. 2000) (quoting *N.W. Enters. Inc. v. City of Houston*, 27 F.Supp.2d 754, 776 (S.D. Tex. 1998)). This is because "[i]t is the legislature, and not the courts, which determines how much testimony is enough to require city action in redressing a perceived problem." *N.W. Enters.*, 27 F.Supp.2d at 776 (quoting *SDJ v. City of Houston*, 636 F.Supp. 1359, 1367 (S.D. Tex. 1986)); *see also Cmty. Visual Communs.*, 148 F.Supp.2d at 775. Then again, though the court must defer to the legislature's stated intent, such deference must not exclusively govern the Court's review. *See id.; SDJ*, 636 F.Supp. at 1367. A court must also consider "whether the [legislative body] relied on evidence in the . . . record from which it could have reasonably determined that negative secondary effects associated with adult businesses actually exist and that the proposed regulations would in some way address these effects." *SDJ*, 636 F.Supp. at 1367.

In enacting Ordinance 287, Kennedale not only relied on its extensive findings in relation to Ordinance No. 108,[5] but also

---

[5] The preamble to Ordinance No. 108, which summarizes the review conducted by Kennedale, states, in relevant part:

> WHEREAS, the City Council of the City of Kennedale, Texas, heretofore adopted regulations restricting the location of sexually oriented businesses within the City of Kennedale based upon studies, reports, and findings regarding the harmful effects of sexually oriented businesses on surrounding land uses; and
>
> WHEREAS the city council deems it necessary and advisable to amend these regulations. . . ; and
>
> WHEREAS, studies, reports, and findings conducted by the

9

reviewed relevant precedent and took into account the continuing secondary-effects problem in Kennedale. (Def.'s Resp. App. at 674, ¶ 5 (Substitute Olson Aff.).) Moreover, Ordinance 287's preamble specifically "finds that some of the concerns that Ordinance No. 108, as amended, was designed to address are still in existence and therefore additional regulations are necessary to adequately

---

>   cities of Austin, El Paso, and Indianapolis regarding the harmful effects of sexually oriented businesses on surrounding land uses have been presented to and reviewed by the city council; and
>
>   WHEREAS, studies, reports, and findings conducted by the cities of Los Angeles, Las Vegas, Houston, Amarillo, and Beaumont were presented to the city council and made part of the public record; and
>
>   WHEREAS, the city finds that churches, synagogues, licensed day care centers, public parks, schools and public libraries are centers of family oriented activities and therefore enhance the quality of life in surrounding areas; and
>
>   WHEREAS, there is convincing documented evidence that sexually oriented businesses, because of their very nature, have a deleterious effect on surrounding land uses, causing increased crime and the downgrading of property values; and
>
>   WHEREAS, the city council desires to minimize and control these adverse effects and thereby protect the health, safety, and welfare of the citizenry; protect the citizens from increased crime, preserve the quality of life; preserve the property values and the character of surrounding neighborhoods; and deter the spread of urban blight; and . . .
>
>   WHEREAS, the city council finds that sexually oriented businesses are frequently used for activities such as prostitution or sexual liaisons of a casual nature; and
>
>   WHEREAS, the concern over sexually transmitted diseases is a legitimate health concern of the city which demands reasonable regulation of sexually oriented businesses in order to protect the health and well-being of the citizens; and
>
>   WHEREAS, the city council finds that these amendments will promote the public health, safety, morals and general welfare of the citizens of the city; and
>
>   WHEREAS, the city council finds that these amendments have neither the purpose nor effect of imposing a limitation or restriction on the content of any communicative materials, including sexually oriented materials, nor do these amendments have the effect of restricting or denying access by adults to sexually oriented materials protected by the First Amendment . . .

*H & A I*, 2005 U.S. Dist. LEXIS 8192, at *18 n.7.

protect the public health, safety and welfare," and "finds that, unless the regulations contained [in Ordinance 287] are adopted, sexually oriented businesses will have an adverse effect on surrounding properties." (Pl.'s App., Ex. A (Ordinance 287).) The record substantiates Kennedale's finding. (Def.'s Resp. App. at 473-640.) Consequently, in light of Kennedale's review, given the statements made and findings announced in Ordinance 287, and considering the actual content of that regulation and the Court's earlier ruling on the Ordinances, the Court must conclude that Ordinance 287 is content neutral.

(b)  *O'Brien*

Pursuant to *O'Brien*, a regulation is valid "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377; *see also Hang On*, 65 F.3d at 1254.

The Court has already examined whether "the governmental interest is unrelated to the suppression of free expression," *O'Brien*, 391 U.S. at 377, concluding that it is. *See Erie*, 529 U.S. at 301 (relying upon content-neutral analysis when evaluating this factor of *O'Brien*). Further, Kennedale's efforts to protect public health and safety are clearly within its police powers. *See*

11

*id.* at 296. And, H&A does not appear to contest Kennedale's authority to pass Ordinance 287.[6]

As for whether Ordinance 287 furthers an important or substantial governmental interest, the Supreme Court has already noted that "combating the harmful secondary effects associated with nude dancing [is] undeniably important." *Id.* And, courts reviewing similar cases have concluded that a substantial governmental interest is involved where governmental bodies seek to combat the types of secondary effects Ordinance 287 and the Ordinances are aimed at preventing. *See Erie*, 529 U.S. at 300-01; *LLEH*, 289 F.3d at 367-69; *Hang On*, 65 F.3d at 1254; *Fantasy Ranch*, CA: 3:03-CV-0089-R, 2004 U.S. Dist. LEXIS 15605, at *13-17 (N.D. Tex. Aug. 9, 2004). These conclusions are substantiated by Kennedale's own evidence, which reflects that sexually oriented businesses in general "pose significant ambient public safety hazards" to their surrounding communities. (*Id.* at 641-45 (McCleary Aff.).)

Moreover, in passing Ordinance 287, Kennedale relied on various cities' studies, citizen comments, precedent in related cases, and statements by police officials. (Def.'s Resp. App. at 674, ¶ 5 (Substitute Olson Aff.); 82-83; 65; 88-89; 94 (Hoover

---

[6] H&A did not address Kennedale's authority to pass Ordinance 287 in the section of its reply brief devoted to *O'Brien*; its brief in support of its motion analyzed Ordinance 287 under the *Renton* standard. Since it elected not to address the issue, the Court considers it waived. *See Bursztajn v. United States*, 367 F.3d 485, 491 (5th Cir.2004); *Whitmire v. Terex Telelect, Inc.*, 390 F.Supp.2d 540, 548 (E.D. Tex. 2005) (discussing abandonment) ("Indeed, because he did not raise or brief these issues in his responsive brief, any claims . . . relying on these theories have been waived and are no longer at issue.") (citation omitted).

Aff.); 647 (Miller Aff.).)[7] All of this evidence indicates that Kennedale's secondary-effects concerns are neither made up nor unsubstantiated, as the record reflects that continuing secondary-effects activity, including alcohol-related incidents and crimes involving guns, assaults, theft, and property damage, is still prevalent in the area despite the Ordinances' enactments. (*Id.* at 473-640; 647 (Miller Aff.).) And, some of these reported incidents even occurred in or directly near Showtime. (*Id.*)

H&A argues that Kennedale cannot establish a substantial governmental interest in passing Ordinance 287 because Kennedale "has no objective proof that [Showtime], in the absence of the newly enacted restrictions . . . , contributes in any manner to any alleged secondary effects in the surrounding community" or that Ordinance 287 will ameliorate the specific secondary effects allegedly caused by Showtime. (Pl.'s Prelim. Inj. Reply. at 5.) Even assuming, however, that the crime incidents reported *at or near Showtime* could not be, at least in part, attributable to that establishment, H&A's argument must fail because Ordinance 287 is a content-neutral regulation, and as such Kennedale enjoys sufficient

---

[7] True, some of the research and findings were drawn from Kennedale's earlier work in passing the Ordinances and Ordinance No. 108 in particular. However, the Court does not find that fact to be of much importance. *See Fantasy Ranch*, 2004 U.S. Dist. LEXIS 15605, at *15-16. Moreover, "in . . . demonstrating that . . . secondary effects pose a threat, the city need not 'conduct new studies or produce evidence independent of that already generated by other cities' to demonstrate the problem of secondary effects, 'so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'" *Erie*, 529 U.S. at 298 (quoting *Renton*, 475 U.S. at 51-52). Thus, in setting forth its interest in passing a regulation, "a local government may place great weight upon the experiences of, and studies conducted by, other local governments, as well as opinions of courts from other jurisdictions." *J&B Entm't, Inc.*, 152 F.3d at 371 (citing *Renton*, 475 U.S. at 51).

13

leeway in justifying the ordinance based on secondary effects. *See Erie*, 529 U.S. at 298.  In such circumstances, "'the government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word.'"  *Id.* at 299 (quoting *Tex.*, 491 U.S. at 406) (citing *O'Brien*, 391 U.S. at 377; *United States v. Albertini*, 472 U.S. 675, 689 (1985); *Clark v. Community for Creative Non-Violence*, 468 U.S. at 299).

Finally, the fourth factor and final *O'Brien* factor--that the restriction is no greater than is essential to the furtherance of the government interest--is also satisfied.  As already discussed, Ordinance 287 regulates mostly non-expressive conduct.  In relation to those restrictions, "any incidental impact on the expressive element of nude dancing is *de minimis*."  *Erie*, 529 U.S. at 301.  The amendments requiring patrons to remain a certain distance from dancers, prohibiting alcohol service if there is nude dancing, and requiring employee permits, are minimal restrictions in furtherance of Kennedale's asserted interest of eliminating the deleterious effects nude-dancing establishments have on their surrounding communities.  *See id.*  And, those restrictions do not limit a dancer's ability to convey an erotic message; rather, they prohibit certain nonexpressive conduct taking place during an expressive presentation.  *See id.; Gary*, 311 F.3d at 1340; *Ben's Bar*, 316 F.3d at 726 ("The First Amendment does not entitle Ben's Bar, its dancers, or its patrons, to have alcohol available during a 'presentation' of nude or semi-nude dancing.").  Further, "the restriction leaves ample capacity to convey the dancer's erotic

message." *Erie*, 529 U.S. at 301 (citing *Barnes*, 501 U.S. at 572 (plurality opinion of Rehnquist, C.J., joined by O'Connor and Kennedy, JJ.); 501 U.S. at 587 (Souter, J., concurring in judgment)).

H&A argues that there are less restrictive means for achieving Kennedale's desired result. But, as noted by the Supreme Court, least-restrictive-means analyses are not required where restrictions are content-neutral, as here. *Id.* (citing *Ward v. Rock against Racism*, 491 U.S. 781, 798-799, n. 6 (1989)). And a city's regulation will not be deemed invalid simply because there is some imaginable alternative that might be less burdensome on speech. *See Albertini*, 472 U.S. at 689 (citing *Community for Creative Non-Violence*, 468 U.S. at 299); *LLEH*, 289 F.3d at 367 (citing *Albertini*, 472 U.S. at 689). Instead, "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," the final *O'Brien* factor is met. *See Albertini*, 472 U.S. at 689 (citing *Community for Creative Non-Violence*, 468 U.S. at 297 ("if the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment")); *LLEH*, 289 F.3d at 367 (citing *Albertini*, 472 U.S. at 689; *Rock Against Racism*, 491 U.S. at 798-99). Here, that standard is satisfied. *See LLEH*, 289 F.3d at 367-70.

Therefore, given that none of the *O'Brien* factors are satisfied, H&A does not have a substantial likelihood of success on the merits on its First Amendment claims.

15

2. <u>Breach of Contract, Preemption by State Law</u>[8]

H&A contends that an injunction is warranted because Kennedale's enactment of Ordinance 287 violates the parties' November 2002 settlement agreement. It also argues that Ordinance 287's requirement that sexually oriented businesses close at midnight violates Texas law which, due to to H&A's liquor license, allows Showtime to serve alcohol until two a.m. The Court concludes that H&A does not have a substantial likelihood of success on the merits on these claims for the reasons stated in Kennedale's response. (Def.'s Resp. at 20-23.)[9]

3. <u>Overbreadth</u>[10]

Though H&A argues that Ordinance 287's employee-permit requirement is overbroad, H&A includes no citation to legal authority in that portion of its brief. Nor has H&A analyzed the issue according to the facts of this case and applicable legal precedent. H&A has therefore wholly failed to demonstrate a substantial likelihood of success as to this claim.

B. <u>Remaining Preliminary-Injunction Elements</u>

Because the Court concludes that H&A has not demonstrated a substantial likelihood of success on the merits for any of its

---

[8] In relation to H&A's fifth and sixth claims for relief.

[9] The Court also notes that, in its reply brief, H&A elected not to respond to Kennedale's arguments on these claims.

[10] In relation to H&A's seventh claim for relief.

claims, the Court need not examine whether the remaining requirements for a preliminary injunction are satisfied.  Injunctive relief is unwarranted.

### III. CONCLUSION

Therefore, H&A's Motion for Preliminary Injunction [doc. # 15-2] is DENIED.

SIGNED May 10, 2006.

                                                      TERRY R. MEANS
                                                     UNITED STATES DISTRICT JUDGE

TRM/kat